JANVIER, Judge.
This is a suit for workmen’s compensation. Plaintiff alleges that during the course of his employment in a hazardous occupation by defendant, Dibert, Bancroft & Ross Company, Ltd., he sustained injury from an accident which arose out of his employment, and that, as a result, he is totally and permanently disabled. He prays for solidary judgment for $30 per week for 400 weeks against his said employer and its insurance carrier, American Mutual Liability Insurance Company.
Defendants, admitting the employment and that the plaintiff’s rate of pay was $1.03 per hour for 40 hours per week, denied that plaintiff sustained any injury as the result of accident during the course of his employment.
From a judgment dismissing his suit plaintiff has appealed.
Plaintiff testifies that he had been in the employ of Dibert, Bancroft & Ross Company, Ltd., hereinafter referred to as the Foundry Company,' for a’little more than a month when, on April 16, 1951, at about .nine1 o’clock in the morning, while working with ,an automatic chipping hammer weighirig 80 or 90 pounds, the hammer slipped and struck him on the right side of his body, and that, as a result, he sustained a hernia on that side. He admits that he did not report the accident on that day, but continued to 'work until the regular closing time at the end of the day. He says that he suffered pain and went to the lavatory where he vomited. In his petition he alleges that he reported for work on the following day but that after working an hour or. so “he began to suffer intensely from his right side,” and that he reported the accident of the previous day to his foreman biit was not offered any medical treatment.
In his testimony he states that on the second day he did not report to the foreman that he had sustained an accident on the previous day, but merely told the foreman that his stomach hurt and that he wanted to see his doctor. He testified that on neither day did he tell anyone that he had been struck by the hammer or had sustained any kind of an accident. He states that on the second day, April 17th, he went to the Charity Hospital where he was told that he was suffering from a hernia and was.also told to report again on the 19th of April, and that on that day this diagnosis was confirmed, and he was told that an operation should be performed, but that it would have to be delayed because there was no hospital bed available. He says that he then returned to the Foundry and reported his condition at the office, but that there he was told he would have to see the foreman. He says that he then saw the foreman, Lee Harvey Hooks, and reported the accident, but that Hooks “was scared to go in the office,” and said: “I’m subject to losing my job.”
Except for the fact that Hives is suffering from a hernia as indicated by the hospital record, which is in the transcript, all of the remainder of,his story is overwhelmingly shown to be a complete fabrication.
The record leaves no room for doubt and convinces us, as it did the trial court, that Hives was suffering from a hernia when 'he entered the employ of the Foundry and that no accident occurred to either cause or aggravate his pre-existing condition.
*753 While plaintiff denies practically • all of the statements of defendants' witnesses, all of whom it must be conceded were employees of the Foundry, and particularly denies that he had sustained the hernia before going to work for the Foundry, the record conclusively shows that when he was employed he stated that he had sustained a hernia some time before and that he was employed and given light work because the foreman felt sorry for him.
When the alleged accident occurred, plaintiff made no statement to anyone concerning it and several days later, after he had been to the hospital, he returned to the Foundry apparently to obtain the “pay”, which he had earned during the first two days of that week. This visit occurred just at the end of the lunch period and the foreman, Hooks, on returning from lunch saw him standing at the gate and asked him what was wrong, and Hives said that he had been to see a doctor about his hernia. The foreman said: “You realize that you had this hernia when I put you on?” and Hives said that that -was true. This conversation was corroborated by three other employees who were returning from lunch and heard Hooks talking to Hives.
Thus not only does the testimony show by an overwhelming preponderance that when he entered the employ he was already suffering from a hernia and that he also admitted it after he terminated his employment, but it also shows that in many other particulars the story toid by Hives was absolutely unworthy of belief. He said that at the time of the occurrence he was doing very heavy work with a hammer or chisel weighing 80 or 90 pounds. The record makes it rather certain that. he was not working, with such a tool but was doing much lighter work, and it makes it absolutely certain that the hammer with which, he said that he was working and which he said weighed 80 or 90 pounds actually weighed 1514 pounds. Furthermore, he said that when the accident occurred he told Isaiah Spears, another employee, that “thé ham.mer kicked and hurt my side.” Spears, though placed on the witness standby plaintiff, denied that Hives had' said anything about any such accident to him. Spears also stated that a few days before the case came to trial in the District Court Hives had come to his house and said that “he was going' to surprise me for Christmas.”
The records of The Charity Hospital at New Orleans show that in three different departments, when the “history” was taken from Hives, he stated that he had first begun to suffer about two weeks before going to the hospital. This is interesting because the accident, if there was one, occurred on April 16th, and the hospital records show that he was examined on April 19th. It is argued that the records of the hospital are incorrect and that,, as a matter of fact, Hives actually said that he had begun to suffer two days, instead of two weeks, before going-to the hospital. It is.also argued that the history was taken only once in the hospital, in the first department at which he reported, and that in the other two departments the incorrect statement was merely repeated as the result of the original error. This, of course, may be true, though in all three reports the statements are worded differently.
But the most conclusive fact which is clear from the hospital record is that at no time did Hives say that thé hernia had resulted from an accident. Surely that is the first statement he would have made had there been an accident.
The only fact which has caused us the slightest concern is that, about ten months or more before the alleged accident, Hives had been in the hospital for treatment for some internal disorder, and a fairly complete examination was made, and yet there is in the report of that examination no statement as to the existence of. a hernia. It. may be that, at the time of the examination, it merely did not disclose the hernia which .actually existed. It 'may be that the hernia was sustained after that and prior to going to work for the Foundry. The record does not justify a conclusion as to when the ■ hernia 'was sustained, but it does convince us beyond the shadow of -a doubt that when he reported for- work at the Foundry *754 he was suffering from a hernia and that no accident occurred while he was working there.
Accordingly, the judgment appealed from is affirmed at the cost of the appellant.
Affirmed.